IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 21, 2010

**STATE OF TENNESSEE v. DAVID CLILON BATES**

**Direct Appeal from the Circuit Court for Marshall County**
**No. 08-CR-121    Robert Crigler, Judge**

_____

**No. M2009-01813-CCA-R3-CD - Filed December 17, 2010**

_____

A Marshall County jury convicted the Defendant, David Clilon Bates, of aggravated rape and assault, and the trial court sentenced him to twenty-two years in the Tennessee Department of Correction.  On appeal, the Defendant contends that the evidence is insufficient to support his conviction and that the trial court erred when it set the length of his sentence.  After a thorough review of the record and the applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

Michael J. Collins, Shelbyville, Tennessee, for the Appellant, David Clilon Bates.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Lacy Wilber, Assistant Attorney General; Chuck Crawford, District Attorney General; Weakley R. Barnard, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the Defendant's rape and assault of the victim and the assault of the victim's son, crimes for which a Marshall County grand jury indicted the Defendant for two counts of aggravated rape and three counts of assault.  The following evidence was presented at the Defendant's trial:  The victim testified that, at the time of these crimes, she was a waitress and worked third shift, from 11:00 p.m. to 7:00 a.m.  The victim and her ex-

husband had a child together and lived together, but the victim's ex-husband was incarcerated at the time of these events. The victim said she had "known of" the Defendant for approximately two years, explaining that she had seen pictures of the Defendant and knew his name through a mutual acquaintance, but did not personally meet him until a week to ten days before these crimes occurred.

The victim testified that the Defendant frequently walked up and down the street in front of her house. On the day the two met, the Defendant was walking by and stopped to throw a football with her seven-year old son who was playing in the yard. During this interaction with the victim's son, the Defendant greeted the victim and they spoke briefly. The Defendant knew the victim's name, which she speculated he learned from people in the neighborhood. The Defendant inquired about the victim's husband and the victim told the Defendant her husband was incarcerated for violating his probation sentence.[1] The victim recalled that, during the days leading to the rape and assaults, the Defendant "pop[ped] up" uninvited at her house five or six times, entering her home on three or four occasions.

The victim testified that, a couple of days after she first spoke with the Defendant, while she was in bed asleep after arriving home from working a night shift, she heard a knock at the door. The victim looked out the window but did not recognize the person standing at her door. Later that day, the Defendant returned and, by the way he was dressed, the victim recognized him as the same person who knocked on her door earlier that morning. This time, the victim opened the door, and the Defendant offered her a drink. The victim declined, stating that she had to work and "didn't have a habit of drinking during the day." The Defendant left, and the victim went back to bed.

The victim recalled that, at some point, the Defendant asked if he could do laundry at her house because his sister's hot water heater was broken. The victim agreed, and the Defendant left and returned with his clothes. The victim was cleaning her house at the time, and the Defendant sat on the couch while he waited for his laundry. The victim said that she spoke with the Defendant in between cleaning tasks. When the Defendant's clothes were laundered, he left.

Several days later, the victim said she was having difficulty "putting up" a pool in her yard. The Defendant was walking by, saw the victim struggling with the pool, and helped her. After helping the victim, the Defendant remained for a few hours, throwing a football with the victim's son and her son's friend. The victim said that she and the Defendant engaged in "chit chat" that day, but she did not remember the specifics of the conversation other than that the Defendant asked when her husband would be released from jail. The victim was not sure

---

[1] The victim explained that, even though she and her ex-husband were divorced, she still referred to him as her husband because they lived together.

of the exact date her husband was to be released, but indicated that her husband would be home soon.

The victim testified that she never went anywhere with the Defendant and only saw him at her house. The victim said that she was aware that the Defendant "liked" her but that she never kissed the Defendant, hugged him, or held his hand. The victim recalled that, the day before the rape in this case, the Defendant asked if she would "be with him," and the victim told him no. The victim said that the Defendant appeared to be "upset" and "mad" at her response and "got very agitated and angry." The Defendant yelled at the victim, saying he "wasn't dealing with this," and left the victim's house. These events concerned the victim, so she spoke with her next-door neighbor, Kelly Rutledge, about the conversation, but the victim then justified the Defendant's anger by reasoning that he "probably got his pride hurt a little bit."

The victim testified that, a few days before the rape, she came home from work and found the Defendant asleep in her bed. The victim explained that, because the locks on her house were not very good, sliding a credit card between the door and the frame would unlock the door. The victim recalled that, upon entering her house, she saw feet "sticking out of [her] bed," which alarmed her. She instructed her son to take her phone, go outside, and if he heard her yell, to call 911. The victim proceeded into her bedroom where the Defendant was asleep on her bed. The victim shook the Defendant's foot and asked what he was doing in her home. The Defendant, who appeared intoxicated, mumbled a response. The victim told the Defendant he needed to leave immediately, and the Defendant sat up on the side of the bed. The victim again told the Defendant to leave, further stating that, if he did not, she would call the police. The Defendant seemed irritated that she woke him but left her house.

The victim recounted the events of the day leading up to the rape. The victim was in the backyard with her son and his friend when the Defendant and Chris Jackson, a man whom she had never met, approached her. The Defendant remained for a few minutes talking with the victim before he left with Jackson. An hour or two later, the victim was sitting on the front porch watching her son and his friend play with water guns. The Defendant and Jackson returned and talked with the victim while she sat outside. Later that evening, Kelly Rutledge, the victim's next-door neighbor, invited the victim to drink beer on Rutledge's back porch, and the victim agreed. The victim did not recall exactly what time it was, but said that there was "still some daylight," when she went to Rutledge's home. The victim testified she drank one-and-a-half beers, and Rutledge drank two while the victim's son was still playing in the victim's backyard. While sitting on the porch, one of the victim's friends called and asked if her son, Austin Green, could spend the night at the victim's house, and the victim agreed. When Green arrived, he joined the victim's son playing in the backyard. The Defendant and Jackson appeared again and sat down on the back steps of the victim's house. Rutledge invited the Defendant and Jackson to come and sit on her porch, but they declined, remaining on the victim's back steps, smoking marijuana. At some point Rutledge's daughter, Elizabeth,

arrived home and joined Rutledge and the victim on the porch.

At approximately 10:00 p.m. or 11:00 p.m., the victim's son said that he was tired so the victim took the boys into the house, and the Defendant and Jackson, without invitation, followed the victim into her house. The victim prepared the boys for bed and, as she walked back into the living room, she saw that the Defendant and Jackson were seated and had "some kind of pink juice with liquor in it." The Defendant and Jackson offered the victim some of the "pink juice," but she took only a sip because it "tasted really bad." The victim went into the kitchen to get a glass of water and, while getting ice, noticed a bottle of vodka in the freezer. The victim said that the bottle of vodka did not belong to her and was not in the freezer earlier that day.

At some point, someone knocked on the front door, and the Defendant said, "[C]ome in," and opened the front door to allow another of the Defendant's friends, Daniel Ewing, to come in. The victim testified that she did not know Ewing but had seen him before. A female accompanied Ewing, but she did not enter the house, having left her red car parked on the street.

The victim testified that Ewing entered her home and started talking with the Defendant. The three men turned on the radio and were drinking. All three men were smoking marijuana, and, at some point, Ewing took a Xanax. The back door of the victim's house remained open, and the Defendant, Jackson, and Ewing went outside a couple of times. The men were getting "kind of loud" outside so the victim asked them to "keep it down." The victim recalled that she was never alone in the house with any one of the men because when one of them went outside, all of three would go. The victim testified that she did not have anything more to drink that night and did not take any drugs, although she had taken prescribed pain medication earlier that day. The victim acknowledged that she had pain medication, Lortab, in the house for pain from a recent shoulder surgery.

At one point in the evening, while the three men sat around her kitchen table, the victim observed Ewing crush pills, and Ewing and the Defendant "snort" the crushed pills. The victim told them, "[T]hat ain't happening" and described the men as "really getting out of hand." The victim told the Defendant, Jackson, and Ewing they needed to leave and then went back to her bathroom.

When the victim exited her bathroom she saw Ewing and Jackson in her bedroom going through her purse. The victim testified that she was very upset and ordered the men out of her house. When she turned around the Defendant was "right in [her] face," and he grabbed her and pushed her into the bedroom. The victim described the Defendant's actions as painful. Jackson dropped what he was holding and ran past the Defendant and the victim out of the house. The victim did not see Jackson again. The Defendant threw the victim onto the bed and told Ewing to put a pillow over the victim's face, which Ewing did. The victim

recalled that she was trying to "kick and fight," was screaming, and "real scared." The victim said that the Defendant was holding her stomach area while Ewing held her arms. She recalled that someone had a knee on her chest, but she did not know whose knee it was. The victim said she was wearing shorts and a t-shirt and that the Defendant pulled her shorts and underwear to the side and penetrated her vagina with his penis. The victim estimated that this occurred within a few minutes of when Ewing and the Defendant began forcibly holding her. Because the victim was screaming loudly during this time, she did not know whether the Defendant said anything as he raped her.

The victim testified that, at some point, the Defendant told Ewing to leave, and Ewing did so but returned and said, "[C]ome on, let's go." The Defendant slammed the bedroom door shut in response. The victim managed to kick the Defendant with her feet and free herself. She opened the bedroom door, and her son and Green were standing outside the door having heard "every bit" of what occurred in the bedroom. The victim instructed the boys to "run and get help," and she ran for the front door, but the Defendant grabbed the victim by her hair before she could get outside of the house. The Defendant then slammed the victim's head against the door facing. The victim recalled that both of the boys were screaming and crying. When the victim's son attempted to stop the Defendant from hurting her, the Defendant grabbed the boy by his arms, picked him up, and threw him "across the living room." The Defendant then resumed hitting the victim. The victim recalled telling the Defendant, "Please, just let me go. I won't tell anybody. I won't say nothing, just please let us go."

During this interaction, the victim's cell phone rang, and the Defendant answered it, but the caller had already disconnected the phone call. The victim said the Defendant then placed a call and told the person they had the wrong number.

The victim recalled that when the Defendant walked back toward the bedroom, the victim opened the front door, "grabbed the kids," and fled. The victim told the boys to go to Rutledge's house. The Defendant came out of the house and began hitting the victim again. The victim saw Rutledge come out on her front porch and heard Rutledge talking with police dispatch on her phone. The Defendant ran toward Rutledge, but Rutledge went into her house and closed the door. The Defendant, once again, returned to the victim and continued hitting her. Shortly thereafter, the victim heard sirens, and the Defendant fled. The victim testified she was transported to the hospital by an ambulance.

The victim testified that she sustained a dislocated pelvis and fractured tailbone as a result of this incident. She also recalled that the Defendant hit her in the face, head, and stomach and that she sustained a cut from being hit by the Defendant. The victim made a positive identification at the police department of the Defendant, Jackson, and Ewing. The victim said that neither the Defendant nor Ewing asked if they could have sex with her and that she did not consent to have sex with either man.

On cross-examination, the victim agreed that she neither divulged to police nor testified at the preliminary hearing that the Defendant smoked marijuana on her back steps in front of her son. The victim also agreed that she testified at the preliminary hearing that she began drinking beer with Rutledge at 10:00 p.m. but that, at trial, she testified it was closer to 8:00 p.m. and "getting dark." The victim explained that she did not keep exact track of the time that evening but maintained that, because it was "getting dark" when she joined Rutledge on her porch, it could not have been 10:00 p.m.

The victim's son, Andrew Watson, who was eight years old at the time of trial, testified that, the night of these crimes, his friend Austin Green was at his house. The victim's son recalled that in the evening his mother was sitting on Rutledge's porch and drinking "Bud Light" while he and Green played in his backyard. The victim's son got tired, so they went into their house and went to bed. Watson testified that Green woke him up, and Watson heard his mother screaming. Watson got out of bed and began banging on her closed bedroom door. Watson recalled his mother "finally got out of the [bed]room" and crawled to the front door to try to open it, but the Defendant punched the victim's hand every time she reached for the door. Watson testified that his mother was screaming and crying, so he punched the Defendant. The Defendant then picked Watson up and threw him onto the couch. Watson said this hurt "a little" and scared him. Watson said that the Defendant continued to hit the victim but that he and Green were finally able to leave the house and run next door to Rutledge's house and ask her to call the police as his mother had instructed. Watson recalled that, when his mother finally made it out of her house, the Defendant followed her and ran up to Rutledge's house, but Rutledge slammed the door shut. Watson heard the Defendant say to his mother, "I am going to hurt you."

Watson testified that, one day, he and his mother arrived home and found the Defendant in his parents bed and the victim told the Defendant to leave or she would call the police and the Defendant left.

Austin Green, Watson's friend who was eight years old at the time of trial, testified that he spent the night at Watson's house and woke up to some noise. He then woke Watson up, and they went into the living room where the Defendant and victim were fighting. Green said that the victim was by the door trying to get out. Green recalled that he and Watson went next door to call the police as the victim instructed but that the victim could not leave because the Defendant kept hitting her. Green testified that he was scared.

Green testified that the Defendant removed the battery from the victim's cell phone and then threw the phone at the victim, saying "call the cops." Green explained that, because the Defendant had taken out the battery, the Defendant knew the victim could not call anyone.

On cross-examination, Green testified that Watson did not go to his mother's room that night. Green said that, when Green and Watson entered the living room, the Defendant told

them to go back to Watson's room.

Kelly Rutledge, the victim's next door neighbor, testified that she invited the victim to sit on her porch and drink a beer around 7:00 p.m. or 8:00 p.m. in the evening. She said they each had two Bud Lights as they sat outside and talked. Rutledge said that the Defendant was sitting on the victim's back steps and that Jackson later joined him. Rutledge told the victim that the men could join them, but they declined. Rutledge said that she did not see the Defendant and Jackson smoking marijuana but that she smelled it. At around 10:00 p.m., the victim's son and his friend were getting tired, so the victim took them inside her house, and Rutledge went into her house to get ready to go to bed.

Rutledge testified that she got into bed but could hear her daughter on the porch talking, so she sent her daughter a text message telling her to quiet down. Rutledge fell asleep and then woke up to "a lot of noise." Rutledge went to the back door, and her daughter was sitting out on the porch talking with Jackson. Rutledge again asked her daughter to keep it quiet so that she could sleep, and she returned to bed. A few minutes later, Rutledge heard "a lot of yelling, screaming, loud talking" so she called her daughter on her cell phone and threatened to call the police if her daughter did not tell Jackson to leave. Rutledge's daughter said the Defendant and "them" were "just messing around." Rutledge told her daughter she had no business outside with three men and instructed her to come inside, and her daughter complied.

Later that night, the sound of a door slamming awakened Rutledge once again. She got up and looked out the bedroom window, but, seeing nothing, she returned to bed. Rutledge continued to hear loud noises and to look outside but saw nothing. At around 2:00 a.m., Rutledge again heard noises and, when she looked out the window, noticed the victim's living room light on and the Defendant standing with both of his hands on the victim's front door. Rutledge called the victim's cell phone "to make sure she was okay," but no one answered. Rutledge had never seen the Defendant at the victim's house that late at night and recalled feeling "uneasy," but she returned to her bed. Rutledge's cell phone rang, and the cell phone displayed the victim as the caller. Rutledge answered the phone, and a male voice asked, "[W]ho is this?" Rutledge told him her name, and the male replied, "I have the wrong damn number" and ended the phone call. Rutledge said the male voice on the phone sounded like the Defendant's voice, and he sounded "very irritated."

A few minutes later, Rutledge heard screaming and the victim's son's voice. Rutledge jumped out of bed and ran to the front door and saw the victim's son and Green running through the yard toward her house. The victim's son was screaming for help, and when Rutledge asked him what was wrong, he replied, "Mama." Rutledge turned and saw the victim on her hands and knees crawling in the yard. Rutledge told the boys to come into the house, and she heard the victim say, "[C]all 911." Rutledge dialed 911 on her cell phone and saw the Defendant running through the yard saying, "[N]obody is calling 911, bitch, you hit

me first." The Defendant ran toward Rutledge's porch, and Rutledge went inside her home and shut the door without the boys because the Defendant was in between the boys and Rutledge. After Rutledge made contact with 911 and requested help, she heard the boys banging at the front door, and she let them inside her house. Rutledge and her daughter went out into the yard and helped the victim into their home. Rutledge recalled that the victim could not walk because she was "shaking so bad." Rutledge observed signs on the victim's body that the victim had been beaten. Rutledge described the victim as "in pain" and "scared." The victim told Rutledge what had occurred between the victim and the Defendant.

Within a few minutes, police arrived, and the victim was transported to the hospital in an ambulance. Rutledge did not know where the Defendant was at this point, not having seen the Defendant again after she shut her front door as he was coming toward her porch steps.

On cross-examination, Rutledge testified that, prior to that evening, she had seen the Defendant at the victim's house "maybe" five or six times over the previous two or three weeks. The latest Rutledge had ever known the Defendant to be at the victim's home previous to that night was one time around 10:00 p.m. Rutledge testified that she had only spoken with the Defendant a "couple" of times before this night but that she recognized his voice on her cell phone.

Scott Braden, a Lewisburg Police Department detective, testified that he went to the victim's residence the morning of the incident to show the victim a photographic line-up. Braden recalled that, when he showed the victim the photographic line-up that included a picture of the Defendant, she immediately "started crying and became very emotional and upset." The victim positively identified the Defendant, Jackson, and Ewing.

Kevin Patin, a Lewisburg Police Department police officer, went to a residence where police believed the victim's attackers were located. Officer Patin met Detective McClain at the residence, and, while McClain knocked on the front door, Officer Patin walked around the house toward the back door where he saw a pit bull dog chained in the back yard, but did not see any person. Officer Patin testified that he heard Detective McClain talking with someone at the front door, so he returned to the front of the house. While Detective McClain was talking with Ewing, Officer Patin heard the dog chain rattle in the backyard, so Officer Patin walked back around the house where, this time, he saw the Defendant crouched down at the crawl space area of the house. Officer Patin escorted the Defendant to the front of the house and instructed him to sit down.

Jimmy Oliver, a Lewisburg Police Department detective, testified that he was present during the Defendant's interview. Upon initial questioning, the Defendant denied being at the victim's house, having sexual contact with the victim, or assaulting the victim. During the interview, the Defendant became "upset" and "angry," and his story changed several times. When presented with some of the evidence from the case, the Defendant agreed he had

been at the victim's house, but still denied any sexual contact with the victim. Detective Oliver recalled the Defendant saying that "he had three or four women that all he would have to do is make a phone call. He could have sex whenever he wanted it. Why would he have to rape her or have sex with her." The Defendant continued to deny he had assaulted the victim saying that "he hadn't touched that girl" and that "[h]e didn't hit women." After awhile, the Defendant acknowledged that, while he had not hit the victim, he had pushed her out of his way, causing the victim injury. The Defendant explained to the detectives that he did so because the victim attacked him first. Finally, the Defendant changed his story as to his sexual contact with the victim. The Defendant told detectives that he had been "seeing" the victim for a week or two and that they had engaged in consensual sex that night.

Santiago McClain, a Lewisburg Police Department detective, testified that he reported to the emergency room and met with the victim. The Detective attempted to interview the victim, but she was crying and shaking, so the Detective waited to give the victim time to calm down before interviewing her. The victim provided the Detective with the names of the Defendant, Jackson, and Ewing as suspects. After getting information from the victim, Detective McClain proceeded to the victim's house, which he found in "disarray." The detective photographed a cell phone and a cell phone battery that were lying on the living room floor. The detective found another cell phone, which was "torn apart," at the entrance to the victim's bedroom and a bottle of vodka in a trash can.

Detective McClain testified that, later that afternoon, he located Ewing and the Defendant and asked them to come to the police station for interviews. At the police station, Detective McClain, along with Detective Oliver, participated in the Defendant's interview. Before the detectives told the Defendant the name of the victim or where the crime occurred, the Defendant volunteered that he had not been to the victim's house the previous evening or ever. The Defendant claimed he had witnesses to prove he had spent the night with his girlfriend. As the interview progressed the Defendant's story changed. The Defendant admitted he was at the victim's house the previous evening, but denied the two had any sexual contact. Later in the interview, the Defendant admitted having consensual sex with the victim. Detective McClain recalled that the Defendant said he and the victim had an argument, and the victim slapped the Defendant in the face, which prompted him to hit the victim. The Defendant told the detectives that the argument was about "some pills" taken from the victim. The Defendant also admitted that he held the victim's arm and threw her on the floor during this argument. Based upon these statements Detective McClain drafted a written statement for the Defendant. The Defendant reviewed the statement and signed it.

Larry G. Kass, an emergency room nurse supervisor, testified that he was working the morning that the victim came to the emergency room for treatment. Kass reviewed the medical records from the victim's visit and agreed that the victim was unable to sign the consent for treatment due to her "emotional state." Kass administered the nurse assessment of the victim, which is a combination of nurse observations and questions to the victim. Kass

read the "chief complaint" portion of the form: "Assault, sexually and physically hit in head. Note abrasions and swelling to left upper forehead and left brow. Pain to abdomen; possibly hit in the stomach. And vaginal pain. States positive vaginal penetration." The assessment indicated that the victim was currently prescribed ibuprofen and Lortab and that her medical history consisted of right shoulder pain. Kass noted in the "emotional status" portion of the form his observation that the victim was anxious and crying, though alert and "oriented to time, place and person." Kass also recalled that the victim displayed "some fear" and embarrassment. Kass related that the victim indicated that there were two assailants, one who held her down while the other raped her. The victim described exiting the bathroom, entering the bedroom, and being hit in the head by her assailant. The victim further described to the nurse that the assailant entered her vagina from the leg of her shorts without actually removing her clothing. Kass testified that a rape kit was performed and the victim's medical records indicated no vaginal tears but tenderness. Kass stated that an absence of vaginal tears is not unusual in rape cases.

Dr. Kenneth Jackson Phelps, Jr. testified as an expert witness in the field of medicine. Dr. Phelps said that he was the victim's primary care physician and that, due to shoulder surgery and pain, the victim was prescribed Lortab. In late June, the victim saw Dr. Phelps for a follow-up visit from an emergency room visit. The victim told Dr. Phelps that the emergency room visit was because she had been raped and severely beaten. The victim complained of pain to her tail bone and shoulder. The doctor found that the victim had some restriction in her forearm and tenderness of her coccyx. Dr. Phelps testified that bruising to the coccyx could be caused by being beaten, "thrown around," or kicked. Dr. Phelps ordered an x-ray report of the shoulder and coccyx, and the report indicated there was not a fracture of the coccyx bone. Dr. Phelps testified that his initial read of the x-rays was that there was a fracture to the coccyx bone, so he sent the x-rays for confirmation and it was that report which indicated there was not a fracture. Dr. Phelps acknowledged that, based on the wording in the victim's records, a lay person might understand it to indicate she had a fractured coccyx. Dr. Phelps testified that he referred the victim to a psychiatrist for panic attacks she was experiencing after the rape. Based upon his experience, Dr. Phelps found the victim's demeanor consistent with that of a rape victim.

Dr. Phelps reviewed the notes of the doctor who administered the victim's pelvic exam and who was deceased by the time of trial. The notes indicated vaginal tenderness but no tearing or bleeding. Dr. Phelps testified that no tears or bleeding to the vaginal wall is not inconsistent with a person who has been raped.

On cross-examination, Dr. Phelps testified that during his twenty-five year career he had worked with approximately ten to fifteen rape cases. Dr. Phelps agreed that, based upon this experience, he could not say what proportion of rape victims suffer vaginal tearing.

Lauralee Staples, a forensic scientist with the Tennessee Bureau of Investigation,

testified as an expert witness in the field of serology and DNA testing. Staples testified that the victim's bra, shorts, t-shirt, underwear, vaginal swab, blood sample, and hair sample were submitted for testing. Staples found semen on the crotch area of the victim's underwear but no sperm. Staples also received samples of blood from the Defendant and Ewing. Based upon these blood samples, Staples excluded Ewing as a contributor of the semen but could not exclude the Defendant as a contributor. Staples testified that she did not have a full profile on the samples and the information she had was consistent with the Defendant. Because she only had a partial profile from the semen sample, she could not definitively "match" the semen from the victim's underwear to the Defendant.

Thomas Hardin testified that, at the time of these incidents, he had known the Defendant "a couple of months" and that he did not know the victim until the Defendant began living with her in March or June. Hardin said that the victim and Defendant came to where he was living, the same month "this stuff went down," and the two acted like a couple. Hardin said that he did not see the two together any other time but did see the Defendant exiting the victim's house "a number of times."

On cross-examination, Hardin testified that he learned of this case when his stepson, Daniel Ewing, became involved. Hardin acknowledged that he would be testifying at Ewing's trial, which was to commence a few weeks after the Defendant's trial. Hardin agreed that, when Detective McClain attempted to interview him, he told the detective, "whatever [Hardin's wife] says is what it is." Hardin explained that he said that because he and his wife were both present for the event the detective was asking about.

Loran Franks testified that, at the time of trial, she was the Defendant's girlfriend. Franks said that, the previous summer, the Defendant and victim lived together. Franks said she was at the victim's house one time while the Defendant lived with the victim and that, while she was there, the Defendant and victim "acted like they were a happy couple." Franks said, other than the Defendant's phone, she did not see any of the Defendant's belongings at the victim's house.

Gesica Brown testified that she was friends with the Defendant and Ewing. Brown met the Defendant through her friend Keona Roseman, with whom the Defendant lived for about a month during the same summer as the criminal incidents in this case occurred. Brown said that she met the victim when the Defendant took Brown to the victim's house. Brown recalled that, for about two weeks, she went to the victim's house daily, and the victim and the Defendant interacted with one another like a couple.

Keona Roseman, Ewing's cousin, testified that she met the Defendant while he was living in a Halfway House almost two years earlier. Roseman described her relationship with the Defendant as "friends" and acknowledged that he lived with her for a period of time. Roseman recalled seeing the Defendant and victim together at Roseman's cousin's house.

Roseman had never met the victim before and asked the victim about her relationship with the Defendant. The victim denied a romantic relationship with the Defendant, but Roseman testified that the two acted "love-y dove-y." Roseman said that, on a later date, she saw the Defendant and the victim standing on the victim's front porch as she was walking to her cousin's house.

Racine Tiers testified that she dated Daniel Ewing "off and on" for seven years and that Ewing and the Defendant were "something like best friends." Tiers recalled that approximately two months before this criminal incident, Tiers saw the Defendant and victim together at Ewing's cousin's house. Tiers said that, when asked, the victim denied a relationship with the Defendant saying, "[W]e're just friends."

On the night of this criminal incident, Tiers went with Ewing to the victim's house. When she arrived at around "[two] something" in the morning, the Defendant and the victim were in the front yard arguing. The Defendant asked Tiers to "take him away" and, as he was getting in the car, the victim pushed the Defendant and "said something to him." The Defendant got into Tiers's car, and Tiers drove down the street to meet Ewing. The victim remained in the yard yelling but then went inside the house with Ewing and the Defendant following her into the house. When Tiers saw police arrive, she assumed a neighbor had called police during the Defendant and victim's argument in the front yard. Tiers went into the victim's house and told everyone to "calm it down" because the police had arrived.

Tiers recalled that, after she entered the victim's house, they all "just sat and talked." Ewing and Jackson went into the kitchen, although Tiers could not see what they were doing, while the Defendant and victim continued to argue. Tiers said that the Defendant began looking for a hat and went "in the back" to search for it. Several minutes later, the victim and the Defendant returned, and the victim sat down in the living room while the Defendant went into the kitchen to talk with Ewing and Jackson. The victim told the Defendant and Jackson they could not spend the night because she did not want her son to "wake up to another man in her bed," and the Defendant became upset and prepared to leave. As he was leaving the victim said "something else to him," and he came back in the house. Ewing stopped the Defendant and pushed him out of the house telling the Defendant, "it wasn't right." Tiers testified that she and Jackson then carried Ewing, who was intoxicated, out of the house, and the Defendant went into the house. Tiers, Jackson, and Ewing went to Ewing's grandmother's house for the rest of the night.

On cross-examination, Tiers testified that the Defendant told her that he hit the victim.

The Defendant testified that he met the victim several months before this incident through a friend who knew the victim's husband. Approximately a month after he met the victim, the Defendant was walking through the victim's neighborhood, and the victim stopped the Defendant and began talking with him. The following month, the Defendant again saw

the victim as he was walking through the victim's neighborhood. The victim was mowing her lawn, and the Defendant stopped and talked with the victim. It was during this conversation that the Defendant inquired as to where the victim's husband was. The victim told the Defendant that her husband was incarcerated.

The Defendant recalled that, the following day, he and Ewing were walking to the Dollar General Market to meet Ewing's girlfriend when the victim offered to give the two men a ride. She drove them to Dollar General Market and Ewing got out of the truck to meet his girlfriend, while the Defendant remained in the truck and talked with the victim. During this conversation, the victim asked the Defendant if the Defendant would come to her house that afternoon and help set up a swimming pool in her backyard. The Defendant agreed, and the victim gave him her cell phone number before he exited her truck. After Ewing and the Defendant finished at the Dollar General Market, they walked back through the victim's neighborhood where the victim was out in her yard, and the Defendant spoke with the victim again.

Later that afternoon, the Defendant returned to the victim's house and "hung out a little while." The Defendant said the victim fixed dinner for him, they watched television, and they "just talked." He described their relationship at this point as "a friendship thing." The Defendant said that, after about two or three weeks of "hanging out," the Defendant and victim engaged in a sexual relationship. The Defendant estimated this was approximately a month before the criminal charge in this case. The Defendant said that, after that first sexual encounter, he stayed over at the victim's house for two weeks straight, and the victim "got a full-time babysitter" for her son. The Defendant explained that the victim's son was around some of the time but that the victim did not want her son to see her touching another man while the victim's father was in jail.

The Defendant recalled that as his relationship with the victim grew they began doing things together in public as a couple such as shopping at Wal-Mart and the grocery store. On one occasion, the Defendant took the victim to a friend's house. The Defendant said that he often took Ewing and Derrick Smith over to the victim's house. The first of June, the Defendant began moving his belongings into the victim's home. By June 19, the Defendant had removed his belongings from the victim's house because the victim's husband was going to be coming home. The Defendant said that the victim asked the Defendant to take his belongings out of her house out of respect for her husband but that she was going to "have a talk with [her husband]."

On the day of the criminal incident, the Defendant recalled that the victim contacted him to ask that he come over that evening because her husband was not going to be released from jail. The Defendant agreed and arrived at the victim's house between 5:00 p.m. and 6:00 p.m. Initially, only the Defendant, the victim, her son, and Green were at the victim's home, but Jackson joined them after dark. The Defendant recalled that he talked with Jackson in the

backyard while the victim sat on Rutledge's back deck drinking beer. The Defendant said he was invited to join Rutledge and the victim, but he declined, remaining in the victim's backyard. Around 9:00 p.m., Ewing arrived at the victim's house, and the Defendant and Ewing began "play fighting." Because both Ewing and the Defendant had been drinking, the "play fighting" turned more serious and "got a little out of hand," but the two men soon calmed down.

At around 10:00 p.m. Ewing left to meet his girlfriend, and the victim took her son and Green inside her house to put them to bed. After putting the boys to bed, the victim came back outside and talked with the Defendant and Jackson. The Defendant recalled that Jackson went next door to talk with Elizabeth and, about thirty minutes later, Ewing returned with Tiers.

The Defendant testified that, after Ewing returned, he wanted to "go do something," but the victim wanted the Defendant to stay with her, so they began to argue in the front yard. The Defendant described the argument as getting "pretty heated" and said the victim pushed him. The Defendant said that he almost pushed her back but that he stopped himself and turned away. Ultimately, the two were able to resolve their disagreement, but the Defendant believed someone called the police due to this argument in the front yard. The Defendant, Ewing, and the victim went in the victim's house, and Tiers soon came inside and told the men police were outside. The Defendant said that he did not actually see police officers but that Tiers told the Defendant the police had been called.

After Tiers joined them, the Defendant turned on music, and Ewing, Tiers, Jackson, the Defendant, and victim sat around talking. Ewing and Jackson went to the kitchen to get more vodka while the Defendant and the victim were "making out." The Defendant recalled that the victim told the Defendant to come with her and led him to the back part of the house. The victim reached for the bedroom door but it was locked, so she took the Defendant into the bathroom. The Defendant said that the two began engaging in sexual intercourse with the Defendant seated on the toilet. The toilet began to rock so they moved to the bedroom. The Defendant tried to open the bedroom door but it was locked so he hit the door and said, "Hey, man." The Defendant heard the door unlock and when he opened the door, he saw Jackson and Ewing in the bedroom. Jackson and Ewing left the bedroom, and the Defendant and victim continued having sex. After a few minutes, the Defendant started feeling sick so he left the bedroom and went into the kitchen where Jackson and Ewing were crushing pills on the table. The Defendant asked Ewing not to crush up the pills on the victim's table and Ewing complied.

The Defendant estimated that it was 2:00 a.m. when Ewing, Jackson, and Tiers prepared to leave. The victim said that she did not want anyone staying in the house that night and the Defendant asked the victim if he could stay and she said no. The Defendant went to get something out of the dryer, and the victim met him there and told him that he could stay

the night but that he needed to leave before her son and Green woke up, and the Defendant agreed. The Defendant said that he then went into the living room to say good-bye to Jackson, Ewing, and Tiers, but they were already leaving. About five minutes after they left, the victim came out of the bedroom "hollering," "He stole my pills!" The Defendant told the victim to "chill out" and tried to make a phone call to Ewing, but either the Defendant's or Ewing's cell phone lost power. The Defendant continued to try to calm the victim, but she insisted that the Defendant was involved in the theft of her medication. The Defendant said that the argument became "heated" and that the victim slapped him after he called her the "'B' word." The Defendant walked away, but the victim came after him and pushed him. When she did this, the Defendant pushed her back and the victim hit the Defendant again. The Defendant testified that it was at this point in the argument that "[he] assaulted the lady."

The Defendant testified that he hit the victim "no more than five times" in the face with his fist. After hitting her, the Defendant bent down to help the victim get up, but she pushed him away. The Defendant said that he tried to apologize, but the victim still refused his help. The Defendant then realized that the victim's son and Green were standing behind the Defendant and had witnessed the Defendant hitting the victim. The Defendant told the two boys to go back to the bedroom. The Defendant said that the victim's son was crying. The Defendant bent down to pick the victim's son up, and the victim's son pushed the Defendant, so the Defendant set him back down on the floor. The victim's son ran to the victim.

The Defendant testified that he began looking for his hat, the victim opened the front door, and the two boys ran outside. The Defendant exited the house through the back door and walked a short distance when he decided to return to make sure the victim was okay. The Defendant said that he was angry at himself "because [he] was wrong" for hitting the victim. The Defendant walked to the front of the house where he saw the victim in the yard and the two boys knocking on Rutledge's front door. The Defendant went up to Rutledge's door about the time she opened it, and, when she saw the Defendant, she closed the door.

The Defendant told the victim he had returned to check on her, and she told him to "get away" from her. The two began cursing at one another, and the Defendant tossed the victim's house key, which she had previously given to him, at her, and the key hit the victim above her eye. The Defendant acknowledged that he "tossed" the house key "pretty hard" but explained that he "wasn't aware of [his] strength" and was "real intoxicated" at the time. The Defendant left the victim's house and walked to Ewing's grandmother's house where the Defendant and Ewing "almost got in a fight." The Defendant than stated that, "everything died down" and that he went into the house and went to sleep.

The Defendant recalled that, the next morning, Jada Hurt, one of the Defendant's friends, woke him up between 9:30 a.m. and 10:30 a.m. The Defendant dressed and then went outside to play with a pit bull that was kept in the backyard when he saw police officers standing in the front yard. The Defendant testified that he "had an idea" why the police

officers were at the house but said he waited in the back yard to be asked to come to the front yard and questioned. The Defendant explained that, when the officer approached him in the back yard, he was kneeling down trying to untangle the dog's chain from some brush and stumps in the back yard.

The Defendant testified that he did not rape the victim explaining, "I'm not trying to sound boastful or nothing, but I didn't have to. I mean, I had lady friends I could go see."

On cross-examination the Defendant testified that he answered the victim's phone the night of this criminal incident. He explained that both he and the victim had the same phone so he accidentally answered her phone thinking it was his phone but then realized he had the wrong phone so told the caller "wrong number" and hung up the phone. The Defendant denied ever going toward Rutledge's house, saying that he "had no reason to go" to Rutledge's front porch. The Defendant acknowledged that Jada Hurt woke him up to tell him police were at the front door talking with Ewing, so he got up, dressed, and went out the back door.

Based upon this evidence, the jury convicted the Defendant of two counts of aggravated rape and three counts of assault. The trial court merged the two counts of aggravated rape and merged two of the three assault convictions. The trial court applied several enhancement factors to the Defendant's sentence and sentenced him to twenty-two years for the aggravated rape conviction, a Class A felony, and to eleven months and twenty-nine days for the assault convictions, Class A misdemeanors. The trial court ordered all sentences to run concurrently for an effective sentence of twenty-two years in the Tennessee Department of Correction.

## II. Analysis

The Defendant asserts that the evidence is insufficient to sustain his convictions and that the trial court erred when it set the length of his sentence.

### A. Sufficiency of the Evidence

The Defendant asserts the evidence is insufficient to sustain his aggravated rape conviction based upon the Defendant's testimony that he engaged in consensual sex with the victim. As to the Defendant's assault conviction concerning the victim, he contends that, because he acted in self-defense, the evidence was insufficient to support an assault conviction. As to his assault conviction concerning the victim's son, he argues that his act of picking the boy up did not amount to an assault. The State counters that sufficient evidence was presented from which a reasonable juror could conclude that the Defendant committed aggravated rape and assault.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

In this case, the Defendant was convicted of aggravated rape and assault. A conviction for aggravated rape requires proof beyond a reasonable doubt that the Defendant unlawfully sexually penetrated the victim and either did so through force and coercion, caused bodily injury, or was aided or abetted by another person and used force or coercion. *See* T.C.A. § 39-13-502 (2009). A conviction for assault requires the State to show that the Defendant "intentionally, knowingly or recklessly" caused bodily injury to the victim or "intentionally, knowingly" caused the victim "to reasonably fear imminent bodily injury." T.C.A. § 39-13-101(a) (2006).

The evidence, considered in the light most favorable to the State, proves that, the night of the rape, the Defendant was at the victim's house and was drinking and smoking marijuana with two of his friends, Ewing and Jackson. The Defendant engaged in "play fighting" with Ewing which quickly escalated due to their intoxication. The Defendant, Jackson, and Ewing went into the victim's house and continued drinking and using drugs. Ewing and Jackson went into the victim's bedroom, and, when the victim discovered them and told them to leave, the Defendant pushed the victim into the room and onto the bed. The Defendant then ordered Ewing to place a pillow over the victim's head, and while the two men forcibly held the victim down, the Defendant sexually penetrated the victim with his penis. Semen was recovered from the crotch of the victim's panties and DNA analysis did not exclude the Defendant as a contributor of the semen. The victim ultimately freed herself and attempted to flee the house, but the Defendant repeatedly blocked the victim's exit through the front door, and he admitted he repeatedly hit the victim with his fist. When the victim's son attempted to intervene to protect his mother, the Defendant picked him up and threw him onto the couch and continued hitting the victim. The victim's son was scared, and both of the boys were screaming and crying. The victim finally was able to exit the house, and, unable to stand due to the assault, she crawled through the front yard. The victim's neighbors called 911 and carried the victim into their home until police arrived. The victim was taken by ambulance to the emergency room and treated for injuries sustained from the rape and assault.

The jury heard the Defendant testify that he engaged in consensual sex with the victim, however, they also heard the victim describe the course of events that evening as well as the injuries she was treated for after the incident. As we earlier stated, all questions of credibility raised are determined by the jury, which is the "primary instrumentality of justice" in matters of credibility of witness testimony. *Bolin*, 405 S.W.2d at 771; *see also*, *Bland*, 958 S.W.2d at 659; *Liakas*, 286 S.W.2d at 859.

The Defendant also contends that the evidence was insufficient as to his assault convictions because he hit the victim only after she first attacked him and, therefore, he acted in self-defense. Further, the Defendant contends that he merely picked up the victim's son and set him back down when the child made it clear he did not want the Defendant to hold

him, which he contends was insufficient evidence to support an assault conviction. Again, the jury heard the Defendant's testimony and clearly did not credit it. It is not within this Court's discretion to re-weigh and determine the credibility of witnesses. *See Matthews*, 805 S.W.2d at 779.

Accordingly, we conclude that the evidence is sufficient to support the convictions beyond a reasonable doubt. As such, the Defendant is not entitled to relief on this issue.

## B. Sentencing

The trial court sentenced the Defendant for aggravated rape as a Range I, Standard offender, which allows for a sentence range of fifteen to twenty-five years. The trial court then considered enhancement factors, finding that four applied, and adjusted the Defendant's sentence upward to twenty-two years. The Defendant appeals this decision, arguing that the trial court's sentence was excessive. The State responds that the trial court properly considered enhancement factors in determining the Defendant's sentence

When a defendant challenges the length, range or manner of service of a sentence, this Court must conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2006). As the Sentencing Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts (2006). This means that if the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record, and gave due consideration to the factors and principles relevant to sentencing under the Sentencing Act, Tennessee Code Annotated section 40-35-103 (2006), the appellate court may not disturb the sentence even if a different result was preferred. *State v. Ross*, 49 S.W.3d 833, 847 (Tenn. 2001). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. *State v. Dean*, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994).

In conducting a de novo review of a sentence, we must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated

sections 4-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2006); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). We must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2006).

Specific to the review of the trial court's finding enhancement and mitigating factors, "the 2005 amendments deleted as grounds for appeal a claim that the trial court did not weigh properly the enhancement and mitigating factors." *State v. Carter*, 254 S.W.3d 335, 344 (Tenn. 2008). The Tennessee Supreme Court continued, "An appellate court is therefore bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Id*. at 346.

The trial court found that there were no applicable mitigating factors, but it found that the following enhancement factors applied:

(1) The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;

(8) The defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community;

(13) At the time the felony was committed, one (1) of the following classifications was applicable to the defendant:

. . . .

(C) Released on probation;

T.C.A. § 40-35-114(1), (8), and (13)(C) (2009).

The Defendant does not claim these enhancement factors are not applicable to him, but claims that "it would have been more appropriate for the Court to enhance only a little past the fifteen year mark." In making this argument, the Defendant states that the sentence is excessive given the relationship between the victim and the Defendant. He also argues that "insufficient prison facilities to accommodate all persons" justifies a lesser sentence.

The trial court stated that, in making this sentencing decision, it relied upon and considered: trial and sentencing hearing evidence, the presentence report, the principles of sentencing, the nature and characteristics of the criminal conduct, and evidence presented as to enhancement and mitigating factors. The trial court made the following findings as to the applicable enhancement factors:

> I find the defendant has a history both of criminal convictions and criminal conduct. . . . [T]he defendant has a total of seven prior misdemeanor convictions. He has no prior felony convictions, as the defense argues. That is duly noted as well. But he does have misdemeanor convictions, which is a criminal record. As the State argues . . . the [D]efendant admits drug use. That is also criminal conduct.

> I believe Mr. Grimes testified there were six probation violations of the [D]efendant's record. And the Court finds that what appears in the Presentence Report on Pages 17 and 18, the Court finds those as facts as to the number of prior probation violations he had and places great weight on that.

> And, also, 13C that the [D]efendant was on probation in two different cases [at the time of these charges].

Based upon these findings as to enhancement factors, the trial court ordered the Defendant to serve a twenty-two year sentence.

As we earlier noted, this Court cannot review the weight placed on enhancement factors. Rather, our review is limited to whether the enhancement factors are supported by the record and appropriately applied. The Defendant is responsible for showing that the trial court improperly sentenced him, and we conclude that he did not meet this burden. His assertion that prison resources are limited is accurate, however, it does not satisfy his burden of showing an improper sentence. Further, the Defendant's bare assertion that a sentence "a little past the fifteen year mark" would have been more appropriate does not satisfy his burden of showing that the trial court's sentence was improper. Our review of the record reveals that the trial court appropriately followed sentencing guidelines. The trial court noted the Defendant's history of criminal convictions and conduct involving illegal drug use. The Defendant failed multiple times at previous conditions of a probated sentence and was on probation in two cases when he committed the crimes at issue.

Based upon the foregoing, we conclude that the trial court appropriately followed sentencing guidelines, made findings of fact adequately supported by the record, and gave due consideration to Sentencing Act principles and factors. We, therefore, affirm the judgments of the trial court.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.


_____
ROBERT W. WEDEMEYER, JUDGE